698 A.2d 1078

**SHERWOOD BRANDS, INC.**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, et al.**

No. 104, Sept. Term, 1996.

Court of Appeals of Maryland.

Aug. 26, 1997.

Albert D. Brault (Daniel L. Shea, James M. Brault, Brault, Graham, Scott & Brault, L.L.C., on brief), Rockville, for Petitioner.

Hugh E. Donovan (Donavan & Broderick, P.C., on brief), Silver Spring, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

This is a dispute between two allied insurance companies (Hartford) and their insured, Sherwood Brands, Inc. (Sherwood), over whether (1) Hartford breached its duty under the insurance policies to defend Sherwood in an action brought against it by a competitor, Osem Food Industries, Ltd. (Osem), and (2) if it did breach its duty, Hartford is liable for attorneys' fees and other litigation costs incurred by Sherwood prior June 18, 1991—the date Sherwood notified Hartford of the underlying action by Osem and demanded coverage. Through rulings on a motion for partial summary judgment and a jury verdict, the Circuit Court for Montgomery County determined that Hartford had breached its duty, that the expenses incurred by Sherwood prior to the notice were reasonable, that Hartford was liable to Sherwood for them, but that Sherwood was not entitled to pre-judgment interest. The total judgment entered by the circuit court was for $497,366, of which $100,000 represented the amount paid by Sherwood in settlement of the Osem litigation, $89,237 was for expenses incurred in prosecuting the instant breach of con-

tract and declaratory judgment action, and the balance was for attorneys' fees and other expenses incurred in the Osem litigation, some part of which was incurred prior to June 18, 1991.

The Court of Special Appeals, resolving cross-appeals by the parties, held, in relevant part, that (1) because Hartford was not prejudiced by the delay in notification, it was liable for the costs incurred by Sherwood on and after June 18, 1991, (2) because Hartford's duty to defend did not arise until it was notified, it was not liable for any fees or costs incurred prior to that date, despite the absence of prejudice from the delayed notice, and (3) Sherwood was entitled as a matter of law to pre-judgment interest on the amount properly owed to it. *Hartford Accident v. Sherwood*, 111 Md.App. 94, 680 A.2d 554 (1996). The court remanded the case so that the circuit court could modify its judgment by excluding expenses incurred prior to June 18, 1991 and adding pre-judgment interest on the remainder. We granted *certiorari* to consider the one question of whether Sherwood was entitled to reimbursement for reasonable litigation expenses incurred prior to June 18, 1991.[1] We shall hold that it was so entitled and therefore shall vacate the judgment of the Court of Special Appeals.

## BACKGROUND

Sherwood, a North Carolina corporation, markets and distributes food products. On January 6, 1989, it and other related defendants were sued by Osem in the United States District Court for the Middle District of North Carolina under both the Federal Lanham Act, 15 U.S.C. § 1125(a), and North Carolina's unfair and deceptive trade practices law, N.C. Gen. Stat. § 75–1.1. The gravamen of the three-count complaint was that, since 1984, Osem had been distributing its soup mix in the United States in a unique and distinctive package and that, in 1988, Sherwood developed and began using a package

---

1. After the opinion of the Court of Special Appeals was filed, the parties entered into an agreement resolving all issues other than Hartford's liability for expenses incurred prior to June 18, 1991.

for its competing soup mixes that was virtually identical to Osem's package. Osem sought injunctive relief, an accounting, treble and punitive damages, and attorneys' fees. Sherwood filed no immediate response to the complaint but rather consented to a court order, entered on January 31, 1989, under which it apparently was enjoined from using its then-current soup package.[2] At that point, Hartford had no contractual relationship with Sherwood.

On February 23, 1989, Hartford issued a Comprehensive General Liability Insurance Policy to Sherwood. The policy, which ran for a year, was renewed annually in 1990, 1991, and 1992. Section I of the policy set forth the various coverages. Under one of them—Coverage B—Hartford agreed, subject to the policy limits, to pay "those sums that the insured becomes legally obligated to pay as damages because of . . . 'advertising injury' to which this insurance applies." That coverage also vested in Hartford "the right and duty to defend any 'suit' seeking those damages." The insuring agreement provided further that Hartford "may investigate and settle any claim or 'suit' at our discretion." Subject to certain listed exclusions, the coverage applied to " 'advertising injury' . . . caused by an offense committed . . . during the policy period[ ] and . . . [i]n the course of advertising your goods, products or services." The term "advertising injury" was defined in Section V of the policy as including the misappropriation of advertising ideas or style of doing business.

Section IV of the policy, captioned "Commercial General Liability Conditions," set forth, among other things, certain duties on the part of Sherwood in the event of an "Occurrence, Claim, or Suit." They included the duties (1) to notify Hartford "promptly of an 'occurrence' which may result in a claim[,]" and (2) if a claim was made or a suit was brought against an insured, to see to it that Hartford received "prompt written

---

2. The order is not in the record before us. The docket entry simply notes that a consent order was entered without prejudice to any answer, motions, or other pleadings that the defendants might file, but it does not reveal the content of the order.

notice of the claim or suit[,]" to "[i]mmediately" send Hartford copies of legal papers received in connection with the claim or suit, and to cooperate with Hartford in the investigation, settlement or defense of the claim or suit. Finally, as relevant here, Section IV stated that an insured would not, except at its own cost, voluntarily make any payment, assume any obligation, or incur any expense without Hartford's consent.[3]

On February 27, 1989—four days after issuance of the initial policy—Osem supplemented its complaint against Sherwood by adding three new claims for relief. The Supplement incorporated by reference the initial complaint and added that, "sometime after January 6, 1989," Sherwood had altered the package it had been using to market its soup but that the new package was "identical or substantially identical" to the old package and was "virtually identical and confusingly similar" to Osem's unique and distinctive package. The three new claims for relief pled in the Supplement were similar to those pled in the initial complaint—violation of the Lanham Act and North Carolina deceptive trade practices laws—except that they applied to the new package allegedly being used by Sherwood. For convenience, the parties have referred to the initial complaint as involving the "green" package and the new claims for relief in the supplemental complaint as involving the "red" package.[4] No notice was given to Hartford of the Supplement.

On August 14, 1989, Osem filed an amended complaint incorporating by reference the initial complaint and the February 27 supplement and adding two additional claims for relief. The new claims—one for defamation and the other charging unfair competition and deceptive trade practice—

---

**3.** The record indicates that in one or more of the renewal policies the language in Sections I and IV was changed. The changes were essentially ones of style and do not affect the issues in this case.

**4.** We are informed in Sherwood's brief that, as a result of the January 31 consent order, Sherwood changed the color of its package from green—the color of Osem's package—to red and made certain other changes as well, but that Osem was not satisfied with those changes.

were based on the averment that, on or about November 28, 1988, Sherwood disseminated to an Osem customer false and misleading statements concerning Osem and its products. No notice was given to Hartford of that amended complaint.

When Osem's initial complaint was filed, Sherwood employed William Spry, a North Carolina attorney who had been representing an allied company in a breach of contract action against Osem, to represent it. When the supplemental complaint was filed, Sherwood, which, by then, had relocated from North Carolina to Maryland, retained Lawrence Hefter, a District of Columbia attorney, to work with Mr. Spry. Mr. Hefter was given a $10,000 litigation budget, which he apparently exceeded by a significant amount. In May, 1991, following a fee dispute and an inability to agree on a modified budget, Sherwood replaced Mr. Hefter with Floyd Gibson. It does not appear that either Mr. Spry or Mr. Hefter ever suggested to Sherwood that Osem's claim might be covered by the Hartford policy, and Sherwood maintained that it was unaware that the claim might be so covered. Shortly after Mr. Gibson was retained, he raised the prospect with Sherwood and, on June 18, 1991, Sherwood notified Hartford of the lawsuit and sent copies of the suit papers.

On July 2, 1991, Hartford acknowledged receipt of the notice but made clear that it was reserving its rights under the policy. It referred to the policy requirement of prompt notice, noted that the June 18 letter was the first notice Hartford had of the claim, and asserted that there was a possibility of prejudice from the late notice and a further possibility, apart from any problem arising from the delayed notice, that an applicable policy was not in effect to cover the claim. On September 18, 1991, Hartford returned the suit papers and declined coverage on the sole ground that, after reviewing the file, it had concluded that "all of the allegations occurred prior to the inception date of the Hartford policy." No mention was made in that letter about the delay in notification.

Faced with that rejection, Sherwood continued to defend the Osem case with its own resources. On November 30, 1992—the eve of trial—Sherwood and Osem reached a settlement, under which Sherwood paid $100,000 to Osem. On June 25, 1993, it filed this action against Hartford seeking (1) a declaratory judgment that Hartford had a duty to defend and indemnify Sherwood in the Osem action and that it breached its contract by failing to do so, and (2) damages for breach of contract. The principal issue was whether the claims made by Osem arose prior to the inception of the policy, although Hartford also contended that there was no coverage because Osem's claims did not constitute an "advertising injury" and because, by not disclosing Osem's claim in its application, Sherwood had made a material misrepresentation.

Rejecting the advertising injury and misrepresentation defenses and persuaded that, at a minimum, the allegations relating to the "red package" set forth in the February 27 supplement arose after the policy was issued and that Hartford therefore did have a duty to defend the action, the court, on August 31, 1994, denied Hartford's motion to dismiss the complaint and granted, in part, Sherwood's motion for partial summary judgment. On January 26, 1995, the court further concluded that (1) Hartford's duty to defend encompassed the entire Osem suit, including the claims made in the initial complaint and the defamation claims added in August, 1990, (2) Hartford breached its duty to defend, (3) Hartford was liable for the reasonable costs and attorneys' fees associated with the defense of the Osem claim, including costs and fees incurred prior to June 18, 1991, as well as the fair and reasonable amount of the settlement, and (4) with respect to the costs and fees incurred prior to June 18, 1991, Hartford was not prejudiced by the timing of the notice. Upon those findings, it granted the balance of Sherwood's motion for partial summary judgment. The jury trial was thus limited to damages. By special verdict, the jury found the following costs and fees to be reasonable: $64,960 paid to Mr. Hefter; $102,688 paid to Mr. Gibson; $61,074 paid to Mr. Spry with respect to the trademark claim; $56,069 paid to Mr. Spry with

respect to the defamation claim; and $100,000 paid in settlement of the Osem claims. In entering its judgment, the court added $23,336 in other litigation expenses and $89,237 for attorneys' fees in prosecuting the declaratory and breach of contract action, for a total judgment of $497,366.

As we indicated, the Court of Special Appeals held that Sherwood was not entitled to recover costs and fees incurred prior to the date it first notified Hartford of the Osem claim. That holding was based on alternative grounds: (1) the court's conclusion that Hartford's duty to defend did not arise until it received that notice, and (2) the policy language precluding Sherwood from voluntarily incurring any expense without Hartford's consent. 111 Md.App. at 116–17, 680 A.2d at 564–65.

## DISCUSSION

### Introduction

As framed by Sherwood in its brief, the question is whether, in light of Maryland Code (1957, 1994 Repl.Vol.), § 482 of Article 48A (recodified effective October 1, 1997 as § 19–110 of the Insurance Article), an insurer is liable for pre-notice fees and costs incurred in the defense of a lawsuit when (1) the insurer breaches its duty to defend after receiving delayed notice of the suit, (2) the insured's delay in giving notice is unintentional and in good faith, (3) the insurer is not prejudiced by the delay, and (4) the fees and costs are reasonable and would have been incurred by the insurer had timely notice been given. That articulation invokes a number of questions concerning the various elements, not to mention what the result might be if one or more of those elements is missing. The issue really hinges on when, in the case of a delayed notice, the duty to defend arises and is breached, whether § 482 has any bearing on the insurer's obligation for pre-notification fees and expenses, and the extent to which an insurer's obligation for pre-notification costs depends on the position it takes after receiving delayed notice.

## Nature of the Duty of Notification

██ The obligation of an insured to notify the insurer of a claim subject to a duty to defend is contractual in nature. It is, obviously, a necessary obligation, in that the insurer can hardly be expected to defend an action or claim it knows nothing about, but it is nonetheless an obligation imposed by the insurance contract, subject to any supervening public policy. In some policies, the obligation is clearly phrased as a condition precedent to any action on the policy. See, for example, *Watson v. U.S.F. & G. Co.*, 231 Md. 266, 269 n. 1, 189 A.2d 625, 626 n. 1 (1963), where the policy not only required the insured to give prompt notice of an accident but also stated that no action would lie against the insurer "unless, as a condition precedent thereto" the insured fully complied with all the terms of the policy. We read that language literally and held that, although the condition could be waived and there may be circumstances in which the insurer might be estopped from asserting it as a defense, it was otherwise one "that must be performed before any obligation on the part of the assurer commences." 231 Md. at 271, 189 A.2d at 627. That was the general rule followed by courts throughout the country and was certainly the rule followed by this Court prior to 1966; indeed, even if the language did not use the word "condition," the duty of notification was regarded as creating a condition precedent to the insurer's obligation to defend or indemnify, and the lack of any prejudice to the insured from the failure to give prompt notice was immaterial. *See Lennon v. Amer. Farm. Mut. Ins. Co.*, 208 Md. 424, 118 A.2d 500 (1955); Employers' Liability *Assurance Corporation v. Perkins*, 169 Md. 269, 181 A. 436 (1935).

That approach has been modified—in some States by common law and in Maryland by statute. In 1964, the General Assembly enacted § 482 of Article 48A. Although initially the statute applied only to automobile liability insurance policies, it was broadened in 1966 to apply to any policy of liability insurance. It currently states:

"Where any insurer seeks to disclaim coverage on any policy of liability insurance issued by it, on the ground that

the insured or anyone claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving requisite notice to the insurer, such disclaimer shall be effective only if the insurer establishes, by a preponderance of affirmative evidence that such lack of cooperation or notice has resulted in actual prejudice to the insurer."

In *St. Paul Fire & Marine Ins. v. House*, 315 Md. 328, 332, 554 A.2d 404, 406 (1989), we characterized § 482 as a response to *Watson* and as making "policy provisions requiring notice to, and cooperation with, the insurer covenants and not conditions." We added that "[t]he statute measures by the standard of actual prejudice the materiality of any breach of those covenants by the insured for the purpose of determining if the breach excuses performance by the insurer." *Id. See also T.H.E. Ins. v. P.T.P., Inc.*, 331 Md. 406, 414, 628 A.2d 223, 227 (1993). It is thus clear that the *Watson* approach of regarding notice provisions as conditions, enforceable without regard to prejudice or lack thereof, has not been the law in Maryland for more than three decades. In order to avoid its duty to defend or to indemnify on the ground of delayed notice, the insurer must establish by a preponderance of affirmative evidence that the delay in giving notice has resulted in actual prejudice to the insurer.

In this case, as we have observed, although Hartford raised the prospect of claiming prejudice from the delayed notice in its initial response, it ultimately decided not to base its decision on that defense but instead declined to defend the Osem claim on the sole ground that the claim was not covered—that it was based on conduct occurring before the policy was issued. Only when sued for breach of the policy did the insurer attempt to support its decision by interposing other defenses, principally that the claim did not constitute an advertising injury and that there had been a material misrepresentation, and only in response to Sherwood's motion for partial summary judgment did Hartford, for the first time, actually interpose the defense of delayed notice. The delay in

giving notice, therefore, apparently played no material role in Hartford's decision not to defend the Osem claim.

The fact that Hartford did not use the delayed notice as a ground for refusing to defend and was unable, in any event, to establish legally sufficient prejudice from the delay ultimately will doom its position. That fact does not, however, eliminate the need to consider the bearing a delayed notice may have on when the duty to defend can properly be regarded as arising and having been breached, and it is to those matters that we shall now turn.

### Duty to Defend and Breach

It is common—almost universal—for liability insurance policies to give the insurer both the *right* to control the defense of any claim covered by the policy and the *duty* to provide that defense. *See* 14 COUCH ON INSURANCE 2D § 51.35 at 438 (Rev. ed. 1982 & Supp.1996). These are, essentially, reciprocal or correlative provisions. The *right* to control the defense, coupled with the corresponding duties of the insured to give prompt notice of any claim and forward relevant papers, to cooperate with the insurer in that defense, to avoid assuming liability, and to refrain from settling the claim or incurring expenses in defense of it without the consent of the insurer, is important to the insurer as a mechanism for protecting and minimizing its duty of indemnification. If it is to be liable for any judgment rendered against the insured, it has a right to make certain that a proper defense is made to the claim and that unwarranted, overstated, and collusive claims are exposed and defeated. *See* 7C APPLEMAN INSURANCE LAW AND PRACTICE § 4681 at 2–4 (Berdal ed. 1979 & Supp.1996–97). The *duty* to defend is primarily, of course, for the benefit of the insured. As we observed in *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 409–10, 347 A.2d 842, 851 (1975), the promise to defend is in the nature of litigation insurance, "protecting the insured from the expense of defending suits brought against him." Not infrequently, that expense may approximate or even exceed the amount of any judgment rendered in the action.

■ Although the issue does not appear to have been litigated, it would seem clear that the right to control the defense necessarily attaches as soon as there is something to defend. The correlative duty of the insured to notify the insurer promptly of an occurrence or a claim is obviously in aid, and assumes the right, of immediate control by the insurer. As a practical matter, of course, that right cannot be effectively exercised until the insurer is, in fact, informed of the occurrence or claim, but it would hardly be sound to conclude that the right does not *exist* or does not *arise* until the notice is given, for if that were the case, the right of control vested in the insurer would effectively be within the control of the insured.

■ The same principles would seem to be applicable with respect to the duty to defend, although the courts have not generally applied, or apparently even considered, that kind of analysis. The duty to defend, rationally, should attach at the same moment the correlative right to control attaches, *i.e.*, when the claim is made or, if the policy so provides, when an insured occurrence happens. If that is when the insurer has a right to exercise control, that is also when its duty to do so should arise. The courts and commentators are not in agreement on that approach, however. A number of courts, including the Court of Special Appeals, have stated that the duty to defend does not arise until the insurer is notified of the claim and asked to undertake the defense. *See, for example, Washington v. Federal Kemper Ins.*, 60 Md.App. 288, 297, 482 A.2d 503, 507 (1984), *cert. denied*, 302 Md. 289, 487 A.2d 292 (1985); *Oweiss v. Erie Ins. Exchange*, 67 Md.App. 712, 718–19, 509 A.2d 711, 714–15 (1986); *Mount Vernon Ins. v. Scottsdale Ins.*, 99 Md.App. 545, 564, 638 A.2d 1196, 1205 (1994), *aff'd in part and rev'd in part, Chantel Associates v. Mt. Vernon*, 338 Md. 131, 656 A.2d 779 (1995). *See also Scottsdale Ins. v. American Empire Surplus Lines*, 791 F.Supp. 1079, 1084–85 (D.Md.1992); *Hartford Acc. & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir.1985); *Rovira v. LaGoDa, Inc.*, 551 So.2d 790, 794 (La.Ct.App.1989), *cert. denied*, 556 So.2d 36 (La.1990); *Am. Mut. Liability Ins. v. Mich. Mut. Liability*, 64

Mich.App. 315, 235 N.W.2d 769, 774–75 (1976), *leave to appeal denied,* Jan. 4, 1976; 14 COUCH ON INSURANCE 2D, *supra,* § 51.35 at 444; 7C APPLEMAN INSURANCE LAW AND PRACTICE, *supra,* §§ 4682 at 24 and 4691 at 240. That, as we have indicated, was the principal basis of the Court of Special Appeals decision in this case regarding pre-notice costs and attorneys' fees.

Where the duty of notification is regarded as a condition precedent to the insurer's duty to defend, a holding that the duty to defend does not arise until the notice is given is logical; it rests on the very nature of a condition precedent. Where, as in Maryland, however, the duty to notify is merely a covenant that, absent a showing of prejudice, does not excuse the insurer from complying with its duty to defend, the logic of such a holding becomes significantly attenuated, for it creates a time gap between the insurer's right to control the defense and its duty to provide one that has no legal underpinning.[5] The standard policy language places no time delay on the existence of the duty and affords no basis for distinguishing between the right and the duty to defend; as noted, the provision at issue here obligates Hartford to pay those sums Sherwood becomes legally obligated to pay as damages because of advertising injury and vests in Hartford "the right and duty to defend any 'suit' seeking those damages."

Many of the cases articulating the notion that the duty to defend does not arise until notice is given involved situations in which an insurer declined to defend because of a delayed notice and was then sued for breach of contract to recover the cost of defense. *See, for example, Towne Realty, Inc. v. Zurich Ins. Co.,* 201 Wis.2d 260, 548 N.W.2d 64 (1996), *recons. denied,* 205 Wis.2d 139, 555 N.W.2d 818 (1996); *Crist v. Insurance Co. of North America,* 529 F.Supp. 601 (D.Utah 1982). At least with respect to post-notification costs, the real

---

**5.** The illogic of such an approach is aptly demonstrated by the following statement in 7C APPLEMAN INSURANCE LAW AND PRACTICE, *supra,* § 4691 at 240: "Clearly the duty to defend arises only when a request is made *and an insurer refuses to defend.*" (Emphasis added.) This would have the duty arise only upon its breach.

issue in those cases was not whether a duty to defend *existed,* for it was stated in the policy, but whether and when it was breached. A duty to defend is not breached until the insurer is notified of the claim and then, without legal justification, declines to undertake the defense. *See TPLC, Inc. v. United Nat. Ins. Co.,* 44 F.3d 1484 (10th Cir.1995); *Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.,* 664 F.2d 252 (10th Cir. 1981); *Norteck, Inc. v. Liberty Mut. Ins. Co.,* 858 F.Supp. 1231 (D. R.I.1994). The duty necessarily preexists; the breach arises from the insurer's conduct following the notice. In this construct, it adds nothing to posit that the duty arises only upon the giving of notice, for it is still the insurer's conduct following the notice that determines the outcome. If the insurer declines to defend on the ground of the delayed notice, the question is whether it suffered sufficient prejudice from the delay; if some other policy defense is asserted, the issue is whether the defense was valid. In either case, the viability of the insurer's action goes to the question of breach, not the existence of the underlying duty.

We acknowledge, as we must, the plethora of cases in which courts have based decisions on the notion that the duty to defend does not arise until notice of the claim is provided, or until the suit papers are forwarded, or until a formal request is made. In none of those cases, however, does the court give any reasoned basis for such an approach. In most of them, the court simply cites one or more earlier cases that said the same thing without any analytic support, *see, for example, Am. Mut. Liability Ins., supra,* 235 N.W.2d at 774–75; in some, the cases cited are not even apposite.[6] We do not find

---

6. A good example is *Manny v. Estate of Anderson,* 117 Ariz. 548, 574 P.2d 36, 38 (Ct.App.1977), *reh'g denied,* Dec. 5, 1977, *review denied,* Jan. 24, 1978, where, in *dicta,* the Court, after holding that there was no breach of the duty to defend "because the insurer did not clearly indicate that it was unwilling to defend[,]" stated that, if there was a breach, it must have been an anticipatory one because "the obligation to defend does not arise until the insurer is presented with a complaint." *Manny* is cited by Couch, *supra,* § 51.35 at 444, for the proposition that "[t]here is no duty to defend if the insured fails to tender the suit to the insurer for defense." *Manny* relied on three

those cases persuasive. They may simply be parroting a conclusion that had a rational basis when the duty to notify was regarded as a condition precedent but that, with the abrogation of that underpinning, no longer is justified. We conclude, instead, that, under the kind of language used in the Hartford policies in this case, the duty to defend arises when an insured claim is filed or insured occurrence happens, but that that duty is not breached, and thus no action will lie for its breach, until the insurer is apprised of the claim or occurrence and thereafter, without legal justification, fails to undertake a defense in accordance with its obligation.

■ Courts that espouse the view that the duty to defend does not arise until notice is given are, of course, prone to conclude that an insurer is not liable for costs and fees incurred by an insured prior to such notice. *See, for example, Gully & Associates v. Wausau Ins.*, 536 So.2d 816, 818 (La.Ct. App.1988) and other Louisiana cases cited therein; *Safeguard Scientifics v. Liberty Mut. Ins. Co.*, 766 F.Supp. 324, 333 (E.D.Pa.1991), *aff'd in part, rev'd in part*, 961 F.2d 209 (3d Cir.1992) (table); *Towne Realty, Inc., supra*, 548 N.W.2d at 68; *SCSC Corp. v. Allied Mut. Ins. Co.*, 533 N.W.2d 603, 614–15 (Minn.1995); *Crist, supra*, 529 F.Supp. at 604; *SL Industries v. American Motorists Ins. Co.*, 128 N.J. 188, 607 A.2d 1266, 1272–73 (1992); *Pitrowski v. Taylor*, 55 Wis.2d 615, 201 N.W.2d 52, 56–57 (1972); *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.*, 882 F.Supp. 930, 946–47 (C.D.Cal.1995), *aff'd*, 93 F.3d 578 (9th Cir.1996); *Aetna Cas. & Sur. Co. v. Chicago Ins. Co.*, 994 F.2d 1254, 1261 (7th Cir.1993). It follows logically that there would be no obligation to pay for litigation expenses incurred by an insured during a time when

---

earlier cases, none of which involved the failure of an insured to notify the insurer of a claim or forward the suit papers but dealt instead with whether the underlying claim was within the policy coverage. *See Pesqueria v. Factory Mutual Liability Insurance Company of America*, 16 Ariz.App. 407, 493 P.2d 1212, 1217 (1972); *Paulin v. Fireman's Fund Insurance Company*, 1 Ariz.App. 408, 403 P.2d 555, 559 (1965); *Lawrence v. Northwest Casualty Company*, 50 Wash.2d 282, 311 P.2d 670, 672 (1957).

the insurer had no duty to defend and therefore no duty to assume litigation expenses. The same result does not necessarily pertain, however, when the issue is one of breach, rather than existence, of the duty to defend. In that setting, the insurer's obligation for pre-notice expenses will depend on the nature of the breach, if any, which merits a more fact-specific inquiry and analysis.

Under the approach we take—that the duty to defend arises upon the happening of the insured event but that the duty is not breached until, after notice of the event, the insurer unjustifiably declines to fulfill its obligations—at least three possibilities bearing on the insurer's exposure for pre-notice litigation expenses are presented: (1) following a delayed notice, the insurer undertakes the defense, (2) following a delayed notice, the insurer declines to undertake the defense based on the delayed notice, asserting that the delay constitutes a material breach on the part of the insured, thereby excusing performance by the insurer, or (3) following a delayed notice, the insurer declines to undertake the defense for some other reason that would likely have been asserted without regard to the delayed notice. In each circumstance, the insurer necessarily looks to the insured's covenant not to incur litigation expenses without the consent of the insurer, which complements the covenants to notify the insurer, to forward relevant papers, and to cooperate with the insurer.

In the first situation, there is no post-notice breach. The insurer honors the duty that preexisted the notice. Had the notice been given earlier, the insurer would have undertaken the defense at the earlier time and therefore would have incurred all, part, or perhaps even more of the expenses incurred by the insured. The relevant question as to pre-notice expenses, to be tested against the covenant not to incur unconsented to expenses, is whether the insurer has been prejudiced within the meaning of § 482: was it reasonable, under the circumstances, for the insured to have incurred the expense; was the expense reasonable; did the expense mate-

rially exceed that which the insurer would likely have incurred in any event had the notice been given earlier? [7]

That approach necessarily follows from the nature of the issue. Although there is no post-notice breach because the insurer has, prospectively, assumed the defense, there is the prospect of a breach if the insurer refuses to reimburse the insured for pre-notice expenses. The refusal would be based solely on the delayed notice and the concomitant covenant not to incur expenses without the insurer's consent, and, as to that issue, § 482 would apply and control. In that regard, we reject Hartford's suggestion that § 482 has no application to pre-notice expenses; there is no warrant for such a view in either the language of the statute or in the legislative intent behind it.

■ In the second and third situations, the insurer's liability for pre-notice expenses depends on the validity of its reason for declining coverage. The issue in the second situation is prejudice, within the meaning of § 482. If the insurer succeeds in persuading a court that it was, indeed, prejudiced by the delayed notice, there would be no breach of the duty to defend and therefore, ordinarily, no liability for any of the costs incurred by the insured, whether pre-notice or post-notice. If, however, the insurer loses on that defense, it would be in no better position, with respect to pre-notice expenses, than the insurer who, in the first situation, undertakes the

---

7. The fact that an expense incurred by the insured was, itself, reasonable in amount does not necessarily resolve the question of prejudice. The insurer may, for example, have an arrangement with competent defense counsel or a competent investigator or other support person to provide service at a negotiated rate. If the insured, in derogation of its contractual duty not to do so, employs counsel or other litigation support persons at rates that, though not facially unreasonable, are nonetheless substantially in excess of those that would have otherwise been paid by the insurer had it been notified and undertaken the defense earlier, the insurer may have some basis for claiming prejudice, at least to the extent of the difference. We need not address that question in this case, as Hartford offered no evidence to establish any such difference.

defense. Subject to the caveat we noted in footnote 8, *ante*, it would be liable for those expenses.

The third situation, which is what we have before us, is the most clear cut. If the insurer declines to defend solely because, in its view, the claim is not even potentially within the policy coverage and the court ultimately agrees with that view, there is no obligation to reimburse the insured for any litigation expenses, whether incurred before or after the notice was given. The timing of the notice has no bearing on the issue. If, on the other hand, as occurred here, the court concludes that the claim *was* potentially within the policy coverage and that, as a result, the insurer *did* breach its duty to defend, the insurer is liable for all damages incurred by the insured as a result of that breach. *Bankers & Shippers. Ins. v. Electro Enter.*, 287 Md. 641, 648–49, 415 A.2d 278, 282–83 (1980); *Brohawn v. Transamerica Ins. Co.*, *supra*, 276 Md. at 409–10, 347 A.2d at 851. In that setting as well, the timing of the notice is ordinarily irrelevant. If the delay in giving notice is not a factor in the insurer's decision not to defend—if it would have declined the defense in any event based on its mistaken conclusion that there was no potential coverage—the insurer should not later be allowed to use the delay as a bar to reimbursing the insured for the reasonable expenses incurred in defending the covered claim.[8]

Upon this analysis, we hold that Hartford is liable for the pre-notice fees and expenses incurred by Sherwood, which the jury found to be reasonable. Because all other issues initially raised in this litigation have been settled by the parties, we shall vacate the judgment of the Court of Special Appeals and direct that the case be remanded to the circuit court for further proceedings in conformance with this Opinion and the parties' agreement.

---

**8.** It is possible, depending on the circumstances, for an insurer to rely on both prejudice from a delayed notice and an argument that the claim is not potentially within the policy coverage. In that event, each defense would have to be explored separately.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION AND WITH THE SETTLEMENT AGREEMENT OF THE PARTIES; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.